292 F.3d 1177
 Patricia BILLINGTON, as Personal Representative of the Estate of Ryan Hennessey and as Guardian Ad Litem for Austin Billington, a minor, and Jenny Hennessey, Plaintiff-Appellee,
v.
David SMITH, individually and in his official capacity as a Detective for the Boise City Police Department; Larry A. Paulson, individually and in his official capacity as Chief of Police for the City of Boise; John Does 1-10, Defendants, and
City of Boise, Defendant-Appellant.
Patricia Billington, as Personal Representative of the Estate of Ryan Hennessey and as Guardian Ad Litem for Austin Billington, a minor, and Jenny Hennessey, Plaintiff-Appellee,
v.
City of Boise, a municipal corporation; Larry A. Paulson, individually and in his official capacity as Chief of Police for the City of Boise; John Does 1-10, Defendants, and
David Smith, individually and in his official capacity as a Detective for the Boise City Police Department, Defendant-Appellant.
 No. 00-36062.
 No. 00-36075.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 18, 2001.
 Filed June 21, 2002.
 
 Kirtlan G. Naylor, Naylor & Hales, Boise, ID, for appellant David Smith.
 Martin C. Hendrickson, Moore, Baskin & Parker, Boise, ID, for appellant City of Boise.
 John C. Lynn, Lynn, Scott, & Hackney, Boise, ID, for appellee.
 Appeal from the United States District Court for the District of Idaho; B. Lynn Winmill, District Judge, Presiding. D.C. No. CV-98-00462-BLW.
 Before KLEINFELD and GOULD, Circuit Judges, and ROLL,[1] District Judge.
 OPINION
 KLEINFELD, Circuit Judge.
 
 
 1
 We consider whether a police officer is entitled to qualified immunity for shooting and killing a motorist.
 
 FACTS
 
 2
 The police officer sued in this case, David Smith, is a detective with the Boise City Police Department. When he came off his shift on the night at issue, he did a stint as a private security guard (as department policy allowed) at a Neil Diamond concert, where his wife and daughter were ushers. Late that evening, as he drove them home in his unmarked police car (also as allowed by department policy), the decedent in this case, Ryan Hennessey, passed him, tires squealing. Hennessey overcorrected when he pulled back into his lane, almost hit a parked car, overcorrected again and careened into the oncoming lane, and almost had a head-on collision with an approaching car. Detective Smith estimated that Hennessey was driving 70 m.p.h. in a 30 or 35 m.p.h. residential zone.[2] Detective Smith turned on his blue police lights and gave chase. Detective Smith did not know it, but Hennessey had been in a hit-and-run collision minutes before, and officers were already looking for Hennessey when Detective Smith radioed the dispatcher.
 
 
 3
 Instead of pulling over when he saw the police car chasing him, Hennessey turned off his headlights, despite it being night, and accelerated. Detective Smith turned on his police siren and radioed his dispatcher that he was pursuing a car "on Gekeler [Lane] eastbound." He read the car's license plate number to the dispatcher and said that "he's now cut his lights." Then, as Detective Smith was describing the car, he reported that "he's just had an accident at — stand by." Hennessey had crashed into the curb, making a loud noise heard by several people from their houses near the crash scene. The dispatcher recognized Hennessey's license plate number as that of the hit-and-run suspect who had been reported minutes before and called for "any unit to assist" Detective Smith, reporting that "he was eastbound on Gekeler." Two patrol units immediately reported that they were "en route," the dispatcher reserved a channel, and two more patrol units reported that they were "en route."
 
 
 4
 Meanwhile, Detective Smith got out of his police car and walked over to the wrecked car, intending to render first aid and arrest Hennessey for felony reckless driving. Since he had radioed the dispatcher, he expected uniformed officers to arrive and assist him within minutes. But he didn't want to await their arrival, because he didn't know how badly injured Hennessey might be. For his own safety and to see what first aid might be needed, Detective Smith walked toward Hennessey's car holding his gun in one hand and a big, 16-inch metal flashlight in the other. He didn't have a side holster for his gun, because he was in plainclothes and wasn't wearing a "duty belt." A "duty belt" holds a side holster, along with other accessories like mace, a baton, and handcuffs. He had a shoulder holster in the car, but he wasn't wearing it because he hadn't wanted to carry a gun at the concert, and he didn't think he had time to take off his jacket and put on the holster before seeing whether Hennessey needed first aid.
 
 
 5
 Hennessey sat slumped in the driver's seat, his eyes closed. He looked unconscious, but in fact he was just very drunk, with a blood alcohol level of 0.285%. The driver's side window was down. Detective Smith told Hennessey he was a policeman and ordered him to put his hands on the steering wheel. Hennessey didn't respond, so Detective Smith again identified himself and repeated his order. This time Hennessey looked at Detective Smith's badge, looked up, and asked, "If I don't, are you going to shoot me?" Detective Smith answered, "If I have to."
 
 
 6
 Instead of putting his hands on the wheel, Hennessey started his car, put it in gear, and tried to race away (witnesses heard his engine revving), but the car was too damaged to move. Detective Smith reached inside the car to turn off the ignition. Hennessey grabbed Detective Smith's flashlight, which Smith was using to pry Hennessey's hands from the steering wheel, but the detective pulled it away from him. Hennessey then turned off the car engine.
 
 
 7
 Detective Smith decided to handcuff Hennessey, and told him to put his hands outside the window, while shouting to his daughter to bring him his handcuffs and turn off the siren. Just as his daughter handed him the handcuffs, Hennessey started hitting him. Because he still couldn't hear the sirens from the backup units he expected, Detective Smith told his daughter to run to the intersection to see what cross street they were near, and radio the dispatcher. While she was doing this, Hennessey grabbed Detective Smith by the throat with one hand and grabbed him by his tie with the other hand. Detective Smith tried to back away, leaving Hennessey behind the closed car door, but Hennessey clambered out of his car window, hanging onto Detective Smith. Then he yelled "Shoot me, motherfucker!" and came at Detective Smith swinging. Detective Smith hit Hennessey repeatedly with his flashlight, hitting one blow squarely on his forehead, but to no effect. Then Hennessey started kicking Detective Smith in the stomach and groin.
 
 
 8
 Detective Smith tried to back away from Hennessey and fend off his blows and kicks, but Hennessey charged him, held him in a bear hug, and grabbed his gun by the barrel. Hennessey landed a solid blow to Detective Smith's head, cutting him, knocking his glasses off, and forcing him back, out of the glare of the police car's headlights and into the surrounding darkness. As he warded off Hennessey's blows to his head and groin, Detective Smith fought for control of his gun. He could feel Hennessey trying to pry his thumb off the gun. Then he felt the gun's slide move back toward the locked position, where it would prevent the gun from shooting. Detective Smith feared for his life and didn't want to disarm his own weapon, so he moved the slide forward, fighting Hennessey's pressure on the gun. At this point, according to Detective Smith's testimony, when the men were still struggling for control of the gun, Detective Smith fired, hitting and killing Hennessey.
 
 
 9
 Realizing that he'd hit Hennessey but not that he'd killed him, Detective Smith shouted to his daughter or wife to bring him his first aid kit. Just then a police car drove around the corner, bringing the back-up Detective Smith had been expecting. The police dispatcher's radio traffic was recorded. A tape of the relevant portion was timed, from the moment Detective Smith reported that he was in pursuit of Hennessey's car to the moment his wife reported "shots fired": two minutes and thirty seconds — one hundred fifty seconds — elapsed.
 
 
 10
 We have commented that "[d]eadly force cases pose a particularly difficult problem... because the officer defendant is often the only surviving eyewitness."[3] But in this case there were several witnesses. Besides Detective Smith's wife and daughter, several residents living nearby heard the crash, saw some or all of the fight, and heard the shooting. A man living in the house in front of where the shooting took place testified in his deposition that he was sitting in his hot tub outside smoking a cigar when he heard a car accelerate "like a race car," heard a crash, and saw the police car's flashing blue lights. Hennessey crashed right in front of the man's fence, so he stood up in his hot tub to see what had happened. A high school student was getting a drink of water in his kitchen before going to bed when he heard the crash; he watched the fight and heard the shooting from his living room. An elderly woman was watching television in her home when she heard tires squealing followed by a crash. She watched the confrontation through her window, but didn't see most of the fight, because she had to go to the bathroom in the middle of it (she'd had three beers). The crash and the flashing blue lights awakened another woman, who looked out her blinds, then threw on clothes and ran outside to see what had happened.
 
 
 11
 The many witnesses' accounts are similar, although they differ in detail. The witnesses who actually saw the men fighting agree that Hennessey was the aggressor and that he was winning the fight. The man in the hot tub testified in his deposition that he could see Detective Smith's shield from where he was, and that Smith kept shouting "police officer, police officer." The man thought "this policeman is going to lose," and called 911, as did one of the other two neighbors.
 
 
 12
 But the witnesses who saw the men just before the shooting differ on whether Detective Smith and Hennessey were grappling with one another when Smith fired. One witness places Detective Smith and Hennessey in contact when the shot went off, another the moment before, but not at the moment the shot was fired. Another witness places them two to three feet apart the moment of the shooting, another three or four feet apart. The woman who was awakened by the crash and was farthest from the scene testified in her deposition that just before the shooting, Detective Smith shoved Hennessey two or three feet from him, and that Hennessey was charging Detective Smith when he shot Hennessey. She couldn't see Hennessey's left hand, and she thought that at the moment of the shooting, he had raised his right hand to hit Detective Smith again. The Bureau of Alcohol, Tobacco, and Firearms laboratory concluded from powder residue that Hennessey was shot from a distance of eight to fourteen inches. The fingerprints on the gun didn't have enough detail to be identified as Hennessey's or Detective Smith's.
 
 
 13
 Hennessey's estate and survivors sued Detective Smith, the Chief of Police, and the City of Boise in state court, under 42 U.S.C. § 1983 for violation of his constitutional rights, and for various state law claims sounding in negligence. The defendants removed to federal district court and moved for summary judgment. Detective Smith based his motion on qualified immunity.
 
 
 14
 Plaintiffs opposed the motion with a report by a retired police chief, D.P. Van Blaricom, retained by plaintiffs as an expert witness. He opined that Detective Smith's conduct was "tactically unreasonable and demonstrated a reckless disregard" for risk to himself and his wife and daughter. He criticized Detective Smith for failing to notify dispatch of the pursuit until after it was over and the cars had stopped (this was mistaken — the police dispatcher log shows that Detective Smith reported that he was in pursuit when it began), for not calling for backup (this too was mistaken — the dispatcher log shows that other units immediately responded to Detective Smith's report), for being with his wife and daughter, for getting out of his car without handcuffs, spray, or baton, and without turning off his siren, for not getting his first aid kit out of his car until after the shooting, for pulling Hennessey out the window of his car (this claim is not supported by any witness's testimony, all of which has Hennessey pulling himself out of the window by holding onto Detective Smith's throat and tie as Detective Smith tried to back away), for not releasing the magazine from his gun to disarm it, and for not being able to subdue a younger, shorter, drunk man in a fight. Van Blaricom also opined that the City of Boise had a policy of tolerating excessive force by its police officers. He reached this conclusion because, among other reasons, he thought the police department's investigation of the shooting was inadequate, the police chief had told Detective Smith "I'm there for you," and (in a paragraph of Van Blaricom's report that the district court struck because "It looks like Van Blaricom padded his numbers") only eight complaints of excessive force out of 278 in nine years had been sustained, a significantly lower rate than the national rate.
 
 
 15
 The district court denied Detective Smith's summary judgment motion. Although the district court ruled that, assuming Hennessey's hand was on the gun, "as of the moment Hennessey grabbed Smith's gun ... Smith had no choice but to shoot," it denied Detective Smith's motion because his "failure to drop off his wife and daughter when the routine traffic stop turned more serious," failure to await backup, failure to use his baton or spray on Hennessey, decision to contact Hennessey "with both hands encumbered," and failure to release his magazine to make his gun unusable, "create questions of fact" as to whether the detective's tactics recklessly created the situation in which force would have to be used. The court granted the city's summary judgment motion on a federal constitutional claim for failure to train, but denied its motion on the state law claims. Detective Smith appeals denial of his motion for summary judgment based on qualified immunity. The City of Boise appeals denial of its motion for summary judgment on the state law claims, on the ground that Detective Smith's innocence of any constitutional violation compels the conclusion that he committed no state law tort, because the state law tort standard is identical to the federal constitutional standard for excessive force claims.
 
 ANALYSIS
 
 16
 We have jurisdiction over Detective Smith's interlocutory appeal from denial of qualified immunity[4] and review de novo.[5]
 
 
 17
 In Saucier v. Katz,[6] the Supreme Court instructed lower courts deciding summary judgment motions based on qualified immunity to consider "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[7] If not, then "there is no necessity for further inquiries concerning qualified immunity."[8] If so, then "the next, sequential step is to ask whether the right was clearly established."[9] A constitutional right is clearly established when, "on a favorable view of the parties' submissions"[10] "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[11] In Saucier, the Supreme Court overruled Ninth Circuit precedent holding that "the inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is the same as the inquiry on the merits of the excessive force claim."[12] The Court rejected our view because an officer might be reasonably mistaken as to the facts justifying his actions, or as to the law governing his actions, so that an officer could use objectively excessive force without clearly violating the constitution.[13] The Court emphasized that lower courts must "concentrate at the outset on the definition of the constitutional right" and "determine whether, on the facts alleged, a constitutional violation could be found...."[14] Thus we will not assume without deciding that Detective Smith violated Hennessey's constitutional rights and move on to the qualified immunity question. Instead, we will first decide whether Detective Smith did in fact violate Hennessey's rights.[15]
 
 
 18
 Hennessey's estate claims Detective Smith used unconstitutionally excessive force when he shot and killed Hennessey. A police officer may reasonably use deadly force where he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."[16] We analyze excessive force claims in the arrest context under the Fourth Amendment's reasonableness standard.[17] We balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake"[18] and ask whether, under the circumstances, "including the severity of the crime at issue, the suspect poses an immediate threat to the safety of the officers or others, or whether he is actively resisting arrest or attempting to evade arrest by flight."[19] The reasonableness inquiry is objective, without regard to the officer's good or bad motivations or intentions.[20] We judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and allow "for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation."[21]
 
 
 19
 Having examined all of the evidence in the record, including the numerous eyewitness depositions, affidavits, and expert reports,[22] and taking the facts in the light most favorable to Hennessey's estate, we hold that the estate has not made out a constitutional violation.
 
 
 20
 Ruling on Detective Smith's summary judgment motion, the district court conceded that, assuming Hennessey was grabbing the gun when Detective Smith shot him, "at that moment, Smith had no choice but to shoot. Any reasonable officer would have done so." On appeal, Hennessey's estate does not challenge this proposition, but argues that there is a genuine issue of fact whether, at the moment of the shooting, Hennessey and Detective Smith were grappling over the gun.
 
 
 21
 We agree that this is a genuine factual dispute: witnesses differed on whether the men were grappling when the shot went off, or whether Detective Smith had pushed Hennessey a few feet away. This factual dispute is immaterial,[23] however, because either way, Detective Smith was locked in hand-to-hand combat and losing. We consider the circumstances, including whether the suspect "is actively resisting arrest or attempting to evade arrest by flight."[24] Hennessey actively, violently, and successfully resisted arrest and physically attacked Detective Smith and tried to turn Smith's gun against him. No one who saw the fight disputes that Hennessey was the aggressor, and that he kept beating Detective Smith even when Detective Smith tried to retreat. Hennessey was trying to get the detective's gun, and he was getting the upper hand. Hennessey posed an imminent threat of injury or death; indeed, the threat of injury had already been realized by Hennessey's blows and kicks.
 
 
 22
 Under the circumstances, a reasonable officer would perceive a substantial risk that Hennessey would seriously injure or kill him, either by beating and kicking him, or by taking his gun and shooting him with it. Indeed, once Hennessey grabbed the barrel of Detective Smith's gun and tried to pry it from his hand, a reasonable officer would infer a substantial possibility that he was fighting for his life. Maybe he could have hoped that Hennessey simply wanted to disarm him, not shoot him, but that would have been a gamble. Under these circumstances, taking the facts alleged in the light most favorable to Hennessey,[25] Detective Smith could have reasonably shot Hennessey even if he had just pushed Hennessey back a few feet.
 
 
 23
 But our task is not completed, because the district court denied summary judgment to Detective Smith on a different ground. The district court assumed that Detective Smith's use of deadly force was reasonable at the moment of the shooting, but denied summary judgment because it found a genuine issue of material fact whether alleged tactical errors made by Detective Smith before the moment of the shooting made his reasonable use of force at that moment unreasonable. It is this theory of excessive force that Hennessey's estate advances against Detective Smith's appeal, and the theory is basically that Detective Smith shouldn't have gotten himself into the situation, so he couldn't constitutionally shoot his way out of it.
 
 
 24
 Hennessey's estate cites a litany of tactical errors — the litany supplied by its expert witness Van Blaricom — that Detective Smith supposedly committed and that got him into the situation:
 
 
 25
 1. He chose to initiate the traffic stop, even though he was in plainclothes with his family;
 
 
 26
 2. He didn't tell his dispatcher where he was;
 
 
 27
 3. His hands were full, with his gun and flashlight;
 
 
 28
 4. He didn't wear his duty belt, with spray, handcuffs, holster and baton;
 
 
 29
 5. He woke Hennessey up before backup arrived;
 
 
 30
 6. He told his daughter to bring the handcuffs to him; and
 
 
 31
 7. He didn't make his gun incapable of shooting.
 
 
 32
 The estate does not proffer another alleged "tactical error" cited by the district court, that "Smith failed to drop off his wife and daughter when the routine traffic stop turned more serious."
 
 
 33
 The record does not support the estate's criticism that Detective Smith didn't give the police dispatcher his location. While he didn't tell the dispatcher the cross-street, he did say "I'm on Gekeler eastbound," and there is no evidence that that wasn't enough to send backup. Backup came. Nor does the record support the estate's claim that the presence of Detective Smith's wife and daughter in the police car somehow made the traffic stop more dangerous. But the rest of the estate's criticisms of Detective Smith are at least arguable on the record.
 
 
 34
 Hennessey's estate relies on a Tenth Circuit case, Allen v. Muskogee, Oklahoma,[26] for the proposition that the reasonable use of force is unreasonable if the officer recklessly got himself into the situation. In Allen, police officers shot and killed an armed suicidal man.[27] The plaintiffs produced evidence that the officers ran toward the man screaming at him to drop his gun and then tried to wrestle it away from him when he wouldn't.[28] The plaintiffs supplied an expert witness who said that police officers are trained to deal with an armed mentally ill or emotionally upset person by getting any civilians out of the way, taking cover, and communicating calmly with the disturbed individual.[29] The Tenth Circuit held that the plaintiffs had created a genuine issue of material fact as to the reasonableness of the police officers' tactics preceding the shooting.[30] The court then held that this dispute precluded summary judgment in favor of the officers based on qualified immunity because the reasonableness of their use of deadly force depended not only on their danger at the moment of the shooting but on whether their "reckless or deliberate conduct during the seizure unreasonably created the need to use such force,"[31] where such conduct was "immediately connected to the suspect's threat of force."[32]
 
 
 35
 The Tenth Circuit limited Allen in Medina v. Cram,[33] another case involving a police shooting of a suicidal man. The man came out of his house staggering toward officers with what appeared to be a gun (it was only a staple gun wrapped in a towel), didn't stop when an officer shot him with a beanbag round, and didn't stop when a police dog bit him.[34] The officers only shot him when he acted as if he were about to shoot at them.[35] In Medina, as in Allen and the case at bar, the plaintiffs produced a former police officer as an expert witness who said the officers' tactics were entirely wrong, that no reasonable officer would have used them, and that reasonable officers would have instead taken cover and calmly talked the man into submission.[36] But the Tenth Circuit held that the police did not use unreasonable force, even if they made those tactical errors, because any such errors did not "rise to the level of reckless or deliberate conduct."[37] The court limited Allen to cases where police conduct arguably creates the need for the use of force, is "immediately connected" with the use of force, and rises "to the level of recklessness, rather than negligence."[38] But even then, the Tenth Circuit held, the "primary focus" remains on "the exact moment of the threat of force."[39]
 
 
 36
 Allen's approach, as limited by Medina, has support in some circuits,[40] but is inconsistent with the views of several other circuits. For example, the Seventh Circuit has held that "pre-seizure conduct is not subject to Fourth Amendment scrutiny,"[41] so that even if the police "concocted a dubious scheme" to bring about an arrest, only the arrest and not the scheme is relevant to the Fourth Amendment reasonableness inquiry.[42] Likewise, the Eighth Circuit has held that a section 1983 case can't get past summary judgment without evidence "that the seizure itself, not its prologue, was unreasonable."[43] The Fourth Circuit goes so far as to say that the focus must be "on the very moment when the officer makes the split-second judgment," and that the events before that moment "are not relevant and are inadmissible."[44]
 
 
 37
 Hennessey's estate would have us adopt the Tenth Circuit's approach, and consider whether Detective Smith's tactics preceding the shooting "created the need to use such force."[45] Detective Smith would have us reject this approach outright. But we need not choose between these opposing positions because our own precedents establish the path we must follow.
 
 
 38
 In Alexander v. City and County of San Francisco,[46] we reversed summary judgment in favor of police officers who shot a mentally ill man in the course of forcibly entering his house to arrest him.[47] Public health inspectors had gotten a forcible entry inspection warrant, to investigate a sewage leak.[48] When officials went to execute the warrant, they heard the man threaten, "I'm going to get my gun and use it," and called the police, who brought in a SWAT team.[49] The SWAT team broke into the house and shot and killed him after he twice tried to shoot his gun at them (it misfired both times).[50]
 
 
 39
 The plaintiffs did not claim that the police used unreasonable force at the moment of shooting; instead, their "excessive force claim turn[ed] on the force the officers used in entering the house, not the force they used or didn't use once they had entered."[51] We held that, without an arrest warrant or exigent circumstances, "the police had no right to enter[his] house" to arrest him, and that the inspection warrant didn't count as an arrest warrant.[52] Thus, the reasonableness of the forcible entry turned on whether the officers entered to arrest the man (and whether exigent circumstances supported the warrantless entry),[53] or whether they entered to execute the inspection warrant, in which case the "massive disproportionality of the response to the problem of a leaky sewer pipe"[54] would render the forcible entry unreasonable.[55] We held that if the police committed an independent Fourth Amendment violation by using unreasonable force to enter the house, then they could be held liable for shooting the man — even though they reasonably shot him at the moment of the shooting — because they "used excessive force in creating the situation which caused [the man] to take the actions he did."[56]
 
 
 40
 We have since placed important limitations on Alexander. In Scott v. Henrich,[57] we held that even though the officers might have had "less intrusive alternatives available to them," and perhaps under departmental guidelines should have "developed a tactical plan" instead of attempting an immediate seizure, police officers "need not avail themselves of the least intrusive means of responding" and need only act "within that range of conduct we identify as reasonable."[58] We reinforced this point in Reynolds v. County of San Diego,[59] which distinguished Alexander because "the court must allow for the fact that officers are forced to make split second decisions."[60] We affirmed summary judgment for the defendant police officers despite experts' reports stating — like the expert report in the case at bar — that the officers should have called and waited for backup, rather than taking immediate action that led to deadly combat.[61] We held that, even for summary judgment purposes, "the fact that an expert disagrees with the officer's actions does not render the officer's actions unreasonable."[62] Together, Scott and Reynolds prevent a plaintiff from avoiding summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.[63] Rather, the court must decide as a matter of law "whether a reasonable officer could have believed that his conduct was justified."[64]
 
 
 41
 We placed an additional limitation on Alexander in Duran v. City of Maywood.[65] In Duran, police officers responding to a report of shots fired in a residential neighborhood walked up the plaintiffs' driveway toward their garage silently, without identifying themselves, and holding their guns.[66] Then they heard someone cocking a pistol and saw an armed man in the garage.[67] They shot him after he ignored their orders to drop his gun and pointed his gun at them.[68] The plaintiffs appealed the jury's defense verdict because the district court did not instruct the jury, under Alexander, that the officers could violate the Fourth Amendment by provoking the use of deadly force.[69] We affirmed, holding that an Alexander instruction is unnecessary where there is no "evidence to show that the officer's actions were excessive and unreasonable" and caused the "escalation that led to the shooting," and where the evidence does not show that the officer's actions "should have provoked an armed response."[70]
 
 
 42
 We read Alexander, as limited by Duran, to hold that where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force. In Alexander, the officers allegedly used excessive force because they committed an independent Fourth Amendment violation by entering the man's house to arrest him without an arrest warrant, for a relatively trivial and non-violent offense, and this violation provoked the man to shoot at the officers.[71] Thus, even though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force because their reckless and unconstitutional provocation created the need to use force.[72]
 
 
 43
 Alexander's requirement that the provocation be either intentional or reckless must be kept within the Fourth Amendment's objective reasonableness standard. The basis of liability for the subsequent use of force is the initial constitutional violation, which must be established under the Fourth Amendment's reasonableness standard.[73] Thus, if a police officer's conduct provokes a violent response, as in Duran,[74] but is objectively reasonable under the Fourth Amendment, the officer cannot be held liable for the consequences of that provocation regardless of the officer's subjective intent or motive.[75] But if an officer's provocative actions are objectively unreasonable under the Fourth Amendment, as in Alexander,[76] liability is established, and the question becomes the scope of liability, or what harms the constitutional violation proximately caused.
 
 
 44
 Alexander must be read consistently with the Supreme Court's admonition in Graham v. Connor[77] that courts must judge the "reasonableness of a particular use of force ... from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[78] That goes for the events leading up to the shooting as well as the shooting. Our precedents do not forbid any consideration of events leading up to a shooting. But neither do they permit a plaintiff to establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.
 
 
 45
 Under Alexander, the fact that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself. The Fourth Amendment's "reasonableness" standard is not the same as the standard of "reasonable care" under tort law,[79] and negligent acts do not incur constitutional liability.[80] An officer may fail to exercise "reasonable care" as a matter of tort law yet still be a constitutionally "reasonable" officer.[81] Thus, even if an officer negligently provokes a violent response, that negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation.
 
 
 46
 But if, as in Alexander, an officer intentionally or recklessly provokes a violent response, and the provocation is an independent constitutional violation, that provocation may render the officer's otherwise reasonable defensive use of force unreasonable as a matter of law. In such a case, the officer's initial unconstitutional provocation, which arises from intentional or reckless conduct rather than mere negligence, would proximately cause the subsequent application of deadly force.[82]
 
 
 47
 In the case at bar, Hennessey's estate has not established that Detective Smith provoked Hennessey's attack, much less committed an independent Fourth Amendment violation that provoked it. All of the estate's criticisms of Detective Smiths tactics fit the "20/20 vision of hindsight" category Graham v. Connor[83] holds must be disregarded.[84] But even if we were to assume for the sake of argument that a jury could conclude that Detective Smith should have sat in his car until backup arrived, or donned all of his equipment before approaching Hennessey, or have taken precautions against Hennessey grabbing him by his throat and pulling himself out of the car window to attack the detective, or that Detective Smith should have dropped off his wife and daughter somewhere before dealing with Hennessey, none of Detective Smith's supposed errors could be deemed intentional or reckless, much less unconstitutional, provocations that caused Hennessey to attack him.
 
 
 48
 The law does not condemn citizens to death any time they resist arrest. Just as some decedents in police shooting cases appear to commit "suicide by cop," it is conceivable that some police officers could commit "homicide by self-defense" by unconstitutionally and intentionally provoking an attack so that they could respond to it with deadly force. Our hundred fifty seconds filled with hot pursuit followed by hand-to-hand combat is not a comfortably ample period in which to consider and evaluate the prudence of alternative tactics.
 
 
 49
 We need not reach the question whether, if Detective Smith violated Hennessey's constitutional rights by shooting him, he would nevertheless be entitled to qualified immunity, because he did not violate Hennessey's rights.[85]
 
 
 50
 We lack jurisdiction over the City of Boise's separate interlocutory appeal from denial of summary judgment on the estate's state law tort claims, because the state law issues raised by those claims are not "inextricably intertwined" with the federal issue of Detective Smith's qualified immunity.[86]
 
 
 51
 REVERSED AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 The Honorable John M. Roll, United States District Judge for the District of Arizona, sitting by designation
 
 
 [2]
 Another person driving home from the concert said Hennessey was only driving 40 m.p.h. when Hennessey passed him. This witness did not see Hennessey when Hennessey passed Detective Smith
 
 
 [3]
 Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994).
 
 
 [4]
 Behrens v. Pelletier, 516 U.S. 299, 305-307, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); Mitchell v. Forsyth, 472 U.S. 511, 528-30, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); Martinez v. City of Oxnard, 270 F.3d 852, 855 (9th Cir.2001); Jeffers v. Gomez, 267 F.3d 895, 903 (9th Cir.2001).
 
 
 [5]
 Martinez, 270 F.3d at 855.
 
 
 [6]
 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)
 
 
 [7]
 Id. at 201, 121 S.Ct. 2151.
 
 
 [8]
 Id.
 
 
 [9]
 Id.
 
 
 [10]
 Id.
 
 
 [11]
 Id. at 202, 121 S.Ct. 2151.
 
 
 [12]
 Katz v. United States, 194 F.3d 962, 968 (9th Cir.1999), rev'd sub nom. Saucier, 533 U.S. at 203-206, 121 S.Ct. 2151 (internal quotation marks omitted).
 
 
 [13]
 Saucier, 533 U.S. at 205-206, 121 S.Ct. 2151.
 
 
 [14]
 Id. at 207, 121 S.Ct. 2151.
 
 
 [15]
 See id. at 201, 121 S.Ct. 2151 (holding that courts must first determine whether the officer violated a constitutional right, rather than "skip ahead to the question whether the law clearly [was] established").
 
 
 [16]
 Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).
 
 
 [17]
 Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).
 
 
 [18]
 Id. at 396, 109 S.Ct. 1865 (citations and internal quotation marks omitted).
 
 
 [19]
 Id.
 
 
 [20]
 Id. at 396, 109 S.Ct. 1865.
 
 
 [21]
 Id.
 
 
 [22]
 See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994) (stating that in deadly force cases courts "must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer, and the available physical evidence, as well as any expert testimony proffered by the plaintiff").
 
 
 [23]
 Rule 56(c) of the Federal Rules of Civil Procedure requires that an issue of fact be both "genuine" and "material" to preclude summary judgment. Fed.R.Civ.P. 56(c) (2001)
 
 
 [24]
 Graham, 490 U.S. at 396, 109 S.Ct. 1865.
 
 
 [25]
 Saucier, 533 U.S. at 201, 121 S.Ct. 2151 ("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").
 
 
 [26]
 119 F.3d 837 (10th Cir.1997)
 
 
 [27]
 Id. at 839.
 
 
 [28]
 Id. at 841.
 
 
 [29]
 Id. at 842.
 
 
 [30]
 Id. at 841.
 
 
 [31]
 Id. at 840 (citation and internal quotation marks omitted).
 
 
 [32]
 Id. (citation and internal quotation marks omitted). See also Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir.1995) ("The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.").
 
 
 [33]
 252 F.3d 1124 (10th Cir.2001)
 
 
 [34]
 Id. at 1126-27.
 
 
 [35]
 Id.
 
 
 [36]
 Id. at 1133.
 
 
 [37]
 Id. at 1132.
 
 
 [38]
 Id.
 
 
 [39]
 Id. But see Holland v. Harrington, 268 F.3d 1179, 1190 (10th Cir.2001) (holding that the "decision to use a SWAT team to make a dynamic entry into a residence constitutes conduct immediately connected with the seizure") (internal quotation marks omitted).
 
 
 [40]
 See, e.g., St. Hilaire v. City of Laconia, 71 F.3d 20, 26 (1st Cir.1995) (rejecting "defendants' analysis that the police officers' actions need be examined for `reasonableness' under the Fourth Amendment only at the moment of the shooting"); Abraham v. Raso, 183 F.3d 279, 291-92 (3d Cir.1999) (expressing "disagreement with those courts which have held that analysis of `reasonableness' under the Fourth Amendment requires excluding any evidence of events preceding the actual `seizure'"). See also Claybrook v. Birchwell, 274 F.3d 1098, 1104-1105 (6th Cir.2001) (where officers had a shoot-out with the decedent, then chased him, then shot and killed him, considering the initial shoot-out in assessing the reasonableness of the subsequent shooting). But see Dickerson v. McClellan, 101 F.3d 1151, 1160-62 (6th Cir.1996) ("segmenting" officers' failure to knock-and-announce from their use of force, and considering the reasonableness of the use of force under the "immediate circumstances").
 
 
 [41]
 Carter v. Buscher, 973 F.2d 1328, 1332 (7th Cir.1992).
 
 
 [42]
 Id. at 1333. But see Deering v. Reich, 183 F.3d 645, 650 (7th Cir.1999) (stating that "the most that can be said, for purposes of our case, is that Carter reinforces the concept ... that the deputies did not need to consider all feasible alternatives in serving the warrant...").
 
 
 [43]
 Gardner v. Buerger, 82 F.3d 248, 254 (8th Cir.1996).
 
 
 [44]
 Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir.1991).
 
 
 [45]
 Allen, 119 F.3d at 840.
 
 
 [46]
 29 F.3d 1355 (9th Cir.1994)
 
 
 [47]
 Id. at 1366-67.
 
 
 [48]
 Id. at 1357-58.
 
 
 [49]
 Id. at 1358.
 
 
 [50]
 Id.
 
 
 [51]
 Alexander, 29 F.3d at 1366 n.12.
 
 
 [52]
 Id. at 1360-61.
 
 
 [53]
 Id. at 1367.
 
 
 [54]
 Id. at 1369 (Kozinski, J., concurring).
 
 
 [55]
 Id. at 1367.
 
 
 [56]
 Id. at 1366.
 
 
 [57]
 39 F.3d 912 (9th Cir.1994)
 
 
 [58]
 Id. at 915.
 
 
 [59]
 84 F.3d 1162 (9th Cir.1996)
 
 
 [60]
 Id. at 1169.
 
 
 [61]
 Id. at 1169-70.
 
 
 [62]
 Id. at 1170.
 
 
 [63]
 The plaintiff's expert's report inReynolds stated that the police conduct was "reckless." Id.
 
 
 [64]
 Id.
 
 
 [65]
 221 F.3d 1127 (9th Cir.2000)
 
 
 [66]
 Id. at 1129-30.
 
 
 [67]
 Id.
 
 
 [68]
 Id. at 1130.
 
 
 [69]
 Id.
 
 
 [70]
 Id. at 1131 (emphasis added).
 
 
 [71]
 29 F.3d at 1366
 
 
 [72]
 Id.
 
 
 [73]
 See Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).
 
 
 [74]
 See Duran, 221 F.3d at 1131.
 
 
 [75]
 See Graham, 490 U.S. at 397, 109 S.Ct. 1865 (holding that the Fourth Amendment's reasonableness inquiry asks "whether the officers' actions are objectively reasonable ... without regard to their underlying intent or motivation") (internal quotation marks omitted).
 
 
 [76]
 See Alexander, 29 F.3d at 1366.
 
 
 [77]
 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)
 
 
 [78]
 Id. at 396, 109 S.Ct. 1865 (internal quotation marks and citation omitted).
 
 
 [79]
 See Daniels v. Williams, 474 U.S. 327, 332-33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (distinguishing constitutional deprivations from negligently inflicted injuries). See Brower v. County of Inyo, 489 U.S. 593, 596-97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (holding that a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied") (emphasis in original).
 
 
 [80]
 Daniels, 474 U.S. at 333, 106 S.Ct. 662 (holding that "injuries inflicted by governmental negligence are not addressed by the United States Constitution").
 
 
 [81]
 Cf. Brower v. County of Inyo, 489 U.S. 593, 596-97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).
 
 
 [82]
 Cf. Harris v. Roderick, 126 F.3d 1189, 1196 (9th Cir.1997) (holding that, for the purposes of section 1983 liability "the requisite causal chain can occur through the setting in motion [of] a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury") (alteration in original; internal quotation marks omitted); Calabretta v. Floyd, 189 F.3d 808, 820 (9th Cir.1999) (social worker's unlawful warrantless entry of family home was relevant to assessing reasonableness of subsequent strip search of child for evidence of abuse).
 
 
 [83]
 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)
 
 
 [84]
 Id. at 396, 109 S.Ct. 1865.
 
 
 [85]
 Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
 
 
 [86]
 See Swint v. Chambers County Commission, 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995); Cunningham v. Gates, 229 F.3d 1271, 1284-85 (9th Cir.2000).