RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SANDRA KRAUSE, individually and as personal representative of the Estate of Matthew Thomas Krause, deceased,

*Plaintiff-Appellant,*

*v.*

BRIAN D. JONES; ERIC GILLMAN; DWAYNE GREGG; REDFORD POLICE DEPARTMENT; REDFORD TOWNSHIP,

*Defendants-Appellees.*

No. 13-2498

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-10265—Bernard A. Friedman, District Judge.

Argued: June 25, 2014

Decided and Filed: September 3, 2014

Before: SUTTON and COOK, Circuit Judges; MARBLEY, District Judge.[*]

---

## COUNSEL

**ARGUED:** Timothy P. Flynn, KARLSTROM COONEY, LLP, Clarkston, Michigan, for Appellant. Karen M. Daley, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees. **ON BRIEF:** Timothy P. Flynn, KARLSTROM COONEY, LLP, Clarkston, Michigan, for Appellant. Karen M. Daley, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees.

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1

SUTTON, J., delivered the opinion of the court, in which COOK, J., joined, and MARBLEY, D.J., joined in part and in the result. MARBLEY, D.J. (pp. 10–13), delivered a separate opinion concurring in part and in the judgment.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge. When law enforcement officers tried to execute a warrant for his arrest, Matthew Krause fled into his home and holed up in a bedroom closet armed with a gun. After negotiating for hours, the officers decided to enter the bedroom, using something called a "flash bang" in the process. In the seconds that followed, Krause fired a shot at the officers, and one of the officers fatally shot Krause in response. At issue is whether the officers used excessive force when entering the bedroom and in shooting Krause. We affirm the district court's grant of qualified immunity to the officers.

I.

The United States Marshals arrived at Matthew Krause's home in Redford at nine in the morning on December 12, 2008. They had a warrant for Krause's arrest for felony possession of more than fifty grams of cocaine. When Matthew opened the door and saw the Marshals, he slammed it shut and ran into a bedroom. The Marshals followed. One of the Deputy Marshals entered the bedroom but left to take cover when he found Krause standing in the corner pointing a handgun at him. As the others took up positions around the bedroom, they again announced themselves and again explained they had a warrant for his arrest. Krause told them he had multiple guns in the bedroom and he would kill anyone who tried to come in. As they continued to encourage him to come out unarmed, he continued to threaten to kill them, saying at one point, "[L]et's do this, I'm ready to die[,] are you[?]" R.14-3 at 2.

The Marshals called the Redford Township Police Department. The Redford SWAT team took up positions in the house, and its negotiator Sergeant Duane Gregg began talking to Krause from the hallway outside the open bedroom door. They talked for the next eight or so hours. Sometimes Krause responded to Sergeant Gregg's questions; sometimes he stayed silent. Sometimes Krause yelled and screamed; sometimes he "got very quiet." R.14-4 at 15 (Tr. at 51).

Krause was "very upset" with the Livonia Police Department, the neighboring department that had issued the warrant for his arrest, and thought it was out to get him. *Id*. at 13, 14 (Tr. at 45, 46). Sergeant Gregg heard Krause threaten "more than once . . . to come out shooting because he knew how that would end." *Id*. at 15 (Tr. at 53). At one point, Sergeant Gregg brought in Krause's father and girlfriend to talk to Krause, but those conversations "went not too well." *Id*. at 16, 20 (Tr. at 56, 70–73).

Around six thirty, a pole camera showed that Krause seemed to be sleeping in the closet, prompting the SWAT team to think about entering the bedroom. They briefly considered having one member of the team enter the room behind a shield, fall on Krause, and try to secure him. But they rejected that idea. More extravagantly, they considered using the SWAT team's tank to bring down the exterior wall of the bedroom and to seize Krause in that way. But they rejected that idea as well. They settled on using a "flash bang," "which emits a loud bang and a bright flash of light," *United States v. Dawkins*, 83 F. App'x 48, 49 (6th Cir. 2003), designed to "stun . . . Krause so he would not have an idea what was going on and who was in the room with him," R.14-6 at 16 (Tr. at 55). Before deploying the flash bang and entering the room, they set their weapons to fire automatically because Krause was armed and had "an assault rifle in the room." *Id*. at 17 (Tr. at 59).

Sergeant Nick Lentine rolled the flash bang into the bedroom. Officer Jones crossed into the room simultaneously "with the flash bang." R.14-5 at 21 (Tr. at 75–76, 81). Officer Butler followed with Lieutenant Gillman behind him. Officer Jones remembers seeing the muzzle flash of a handgun "after the flash bang," as Krause shot at him. *Id*. at 22–23 (Tr. at 81–82). Lieutenant Gillman heard shots before he entered the room—"one round, one shot, and then there was a short pause, and then there was some multiple rounds." R.14-6 at 18, 19 (Tr. at 62, 67). Once inside, Lieutenant Gillman saw Officer Jones sitting down "checking himself" to see if he had been shot. *Id*. at 18 (Tr. at 63). He also saw Krause seated in the closet with his hand on a gun. The entire exchange took "seconds." *Id*. at 19 (Tr. at 67). Officer Butler removed the gun from Krause's hand. Krause was transported to the hospital, where he was pronounced dead. An investigation of the bedroom showed Krause had fired one round from a .38 revolver

toward the doorway from the closet.  R.14-3 at 3.  A medical examination revealed that Krause had suffered twenty gunshot wounds.  R.17-6 at 4–14.

Matthew's mother sued Sergeant Gregg, Lieutenant Gillman, Officer Jones, the Redford Police Department and Redford Township.  Her complaint claimed, as relevant here, that the officers violated Krause's Fourth (and Fourteenth) Amendment rights by using a flash bang and by shooting Krause, and that their actions independently amounted to gross negligence under state law.  The district court granted the defendants' motion for summary judgment on all claims on qualified-immunity grounds.

II.

Qualified immunity shields officers from section 1983 constitutional torts so long as the officers did not violate the clearly established constitutional rights of the claimant.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  In assessing that immunity at the summary-judgment phase of the case, we give the plaintiff the benefit of all reasonable factual inferences from the record, asking only whether the officers are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Qualified immunity protects the officers in this instance.

*Use of the flash bang.*  There are several problems with Krause's claim that the officers violated her son's Fourth Amendment rights when they used a flash bang before entering the room.  The complaint as an initial matter does not identify any way in which the device improperly seized or otherwise harmed him.  And neither the appellate briefs nor oral argument fill this gap.

Even if that were not the case, the officers' use of a flash bang in this instance was reasonable.  Faced with a troubled young man resisting arrest on drug charges, threatening to shoot them, expressing his willingness to die, and refusing all requests to surrender peacefully, the officers sought to minimize the risk of injury to themselves and others in entering the room.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  Waiting until Krause appeared to be asleep was one part of the plan.  Using a flash bang was the other.  As the officers reasonably saw it, both features of the plan diminished the risk of injury to themselves and others.  Yes, the light and noise would wake Krause.  But the light and noise surely would stun and confuse Krause,

giving the officers a chance to subdue Krause before he could act.  And of course the flash bang dealt with the risk that Krause only appeared to be sleeping but was not.

All of these increases in officer safety came with little downside, including the kinds of downsides that have led other courts to be skeptical of the use of a flash bang or to find it unreasonable.  The suspect was isolated in one room, precluding the risk that the flash bang could harm others, including children, the elderly or others in the wrong place at the wrong time. *See Boyd v. Benton Cnty.*, 374 F.3d 773, 779 (9th Cir. 2004); *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997).  The officers had a clear view into the bedroom and closet, allowing them to ignite the flash bang away from the closet and not on Krause.  *See Estate of Escobedo v. Martin*, 702 F.3d 388, 407–08 (7th Cir. 2012).  Nothing indicated that Krause had other health problems that could be triggered by the device.  *See Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005).  And nothing indicated that the condition of the room could create other problems if a flash bang were ignited.  *See Bing ex rel. Bing v. City of Whitehall, Ohio*, 456 F.3d 555 (6th Cir. 2006).

*Bing* illustrates the two sides of the line.  The police responded to a report of an intoxicated man, Bing, who had shot at a group of children on his street.  After unsuccessfully trying to persuade Bing to leave his house for two hours, the police threw pepper spray and a flash bang into a window.  Bing then shot at the police, who threw another flash bang into the house.  The house caught fire, and Bing died inside.  *Id.* at 558–63.  We held that the officers acted reasonably in using the first flash bang to try to force Bing out of his house.  The officers needed "to disarm Bing and place him under arrest to abate the threat that he posed to people in the area." *Id.* at 570.  Yet the second flash bang crossed the reasonableness line because the officers had "full knowledge that it [would] likely ignite accelerants and cause a fire" and thus created a "mortal," and unnecessary, "threat" to the suspect.  *Id.* (internal quotation marks omitted).  In this instance, no comparable safety concerns cloud the record.

When put under the microscope of hindsight, it is true, the encounter did not end well.  But it is difficult to say that the flash bang, even from the perspective of hindsight, had anything to do with it.  At all events, we judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

From that vantage point, the officers acted reasonably. *See also Graves v. Bowles*, 419 F. App'x 640, 643–44 (6th Cir. 2011) (finding the use of a flash bang outside of a suspect's car reasonable where officers had "reason to believe that Graves might be dangerous when they tried to arrest him"); *Dawkins*, 83 F. App'x at 51 ("[T]he officers' use of the flash-bang diversionary device [was] objectively reasonable" in executing a search warrant at the apartment of a man with a prior conviction for facilitating a murder and who likely possessed an assault rifle.).

Because the officers complied with the Fourth Amendment in using the flash bang, it follows that they did not violate any clearly established law in doing so. Even *Bing,* which found a constitutional violation with the second use of the flash bang, determined that the officers did not violate clearly established law.

*Fatal shooting.* The officers' use of deadly force—shooting Krause—also did not violate his Fourth Amendment rights. Whether an officer reasonably uses deadly force turns on whether "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Officer Jones fired at Krause after he saw the flash of another gun. An officer in Officer Jones' position—one who saw the flash of a gun pointing at him, who knew that Krause was armed, and who had heard him threaten to shoot—reasonably could think that Krause posed a serious threat to him and the two officers behind him. For that reason, Officer Jones acted reasonably in using deadly force. *See, e.g., Simmonds v. Genesee Cnty.*, 682 F.3d 438, 445 (6th Cir. 2012) (holding that officer reasonably used deadly force when faced with a suspect who "had been drinking," "was possibly suicidal," "fled into a heavily-wooded area," "ignored repeated orders to show his hands," "threatened the officers by yelling, 'I have a gun,'" and "brandish[ed] a silver object . . . as if it were a weapon"); *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 404–06 (6th Cir. 2007) (holding that a police officer reasonably decided to shoot a suspect "to prevent [him] from firing at" other officers in light of the suspect's "proximity to the [other officers] while armed with a rifle, his prior violent behavior, and his continued refusal to surrender and face arrest").

The claimant offers several rejoinders to this conclusion. She suggests that Krause may have been asleep with his hand on the trigger of the gun and might have fired accidentally when the flash bang jolted him awake. Yet Krause's intent, or lack of intent, in firing the gun has no

role to play. We judge Officer Jones' reasonableness "from the perspective of a reasonable officer on the scene," *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (internal quotations omitted), and a reasonable officer in his shoes would have no way of knowing whether Krause fired his gun intentionally or accidentally—and would not be required to wait for a second shot to see.

She adds that her expert questioned whether Krause fired his gun at all. But this argument lacks any support in the record. She never identified any such expert, and a search of the record does not turn up a report or deposition of any expert. At argument, she elaborated that a coroner from another county performed a second autopsy on Krause and did not find any gunpowder residue on his hands. But this autopsy was performed *after* Krause was embalmed, precluding any reasonable inference that Krause did not fire the first shot and explaining why the report itself nowhere concludes that Krause did not fire at Officer Jones.

Even if Officer Jones had the right to use deadly force in self-defense, she questions the use of so much force—twenty rounds in all. But, so far as the record shows, the number of rounds fired by the officer flows from the reasonable decision to engage the automatic-trigger function on his gun before entering the room. And no evidence shows that Officer Jones continued firing after he knew that he had already incapacitated Krause or that Krause had given up. "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.* at 2022.

Plaintiff asks, last of all, why the officers opted to enter the bedroom instead of waiting for Krause to exit on his own. But the officers did try waiting—ten hours in all devoted to trying to coax Krause out of the bedroom. This was not an impulsive entry. At any rate, "the police need not have taken that chance and hoped for the best." *Scott v. Harris*, 550 U.S. 372, 385 (2007). Keep in mind that Krause never backed off his suicidal threat during the stand-off to emerge with guns firing. The assumption that waiting carried no risks of its own is belied by the reality that, so far as they knew, Krause could have emerged at any point and acted on this threat to "come out shooting" or could have taken his own life during the delay. That is why continuing to wait was not, as the claimant suggests, a risk-free option. The officers reasonably waited until Krause fell asleep and opted to act then. No doubt, the plan did not end well,

leaving us with the seen consequences of the officers' actions (the regrettable death of a child and brother) and the unseen possibilities of what might have been (perhaps no death at all). Yet when the Supreme Court warns lower courts not to judge the reasonableness of an officer's action from the peace and safety of their chambers "with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, this is what they mean. The question for us is: Did the officers act reasonably based on what they knew at the time? The answer on this record is: Yes.

The concurrence questions the officers' decision to enter the bedroom with their weapons set to fire automatically. But it is not clear why. Krause had shown no concern for his own safety or that of others and had threatened many times to shoot the officers if they entered. Once Krause delivered on his threat and fired at Officer Jones, all agree that Officer Jones could reasonably fire back and could keep firing "until the threat [was] over." *Plumhoff*, 134 S. Ct. at 2022. And all agree that nothing in the record suggests that Officer Jones kept firing even after he knew Krause no longer posed a threat. If it is true that officers may fire "15 shots" in a "10-second span" *when the suspect is not even shooting at the officers*, as *Plumhoff* allowed, *id.*, it must be true that officers may return fire with an automatic weapon when they are being fired upon. Indeed, Krause does not argue that, accepting that Krause shot at Office Jones, Officer Jones could not respond with shots from an automatic weapon. Not one of the cases cited by the concurrence contradicts this rule.

The concurrence adds that "There was no need for Matthew Krause to die." We agree and have considerable sympathy for his family. But as the record confirms, the reason Matthew Krause died was that he fired first. Officer Jones had every right in such a dangerous situation, proved dangerous the minute he entered the room, to engage the automatic-fire function on his gun before entering the room and to use it after entering the room and being fired upon. The plaintiffs offer no evidence, case law, custom or anything else that says otherwise.

That leaves one loose end. The complaint raised a state law gross negligence claim. It did not explain the basis for that claim. The response to the defendants' summary judgment motion did not either. *See* R.17 at 19 (mentioning the phrase "gross negligence" but referencing excessive force cases). Nor did the motion for reconsideration mention the claim. *See* R.21 at 4. The district court could have treated this undeveloped claim as a forfeited one. *See Brown v.*

*United States*, 545 F. App'x 435, 437–38 (6th Cir. 2013). It instead, generously we think, assumed the gross negligence claim was based on the same conduct—the flash bang and shooting—as the excessive force claim. R.19 at 8. For the reasons just given, the decisions to use a flash bang and to shoot Krause were reasonable, not "reckless," Mich. Comp. Laws § 691.1407(8)(a), and so do not amount to gross negligence.

For these reasons, we affirm the district court's judgment.

---

**CONCURRING IN PART AND IN THE JUDGMENT**

---

MARBLEY, District Judge, concurring in part and concurring in the judgment.

I concur in the court's holding that the officer's use of deadly force in this case, where Krause fired first, did not violate Krause's Fourth Amendment rights. An officer in the position of Officer Jones, who had heard Krause's threats, knew that he was armed, and saw the muzzle flash of Krause's gun, reasonably could determine that Krause posed a serious threat to him and to other officers, and that the threat must be neutralized.

I write separately, however, to express my disagreement with the court's conclusion that it was reasonable for Officer Jones to shoot Krause twenty times. *See* R. 17-6 at 4-14. The majority flatly announces that the number of rounds fired by Jones "flow[ed] from the reasonable decision" of the officer to engage the automatic-fire function of his weapon. *Supra* at 7; I find such a decision to be neither reasonable nor inevitable. The majority notes that, if an officer is justified in firing, he may continue to fire until the threat has ended. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014). But this analysis ignores any consideration of the decisions—and the reasonableness thereof—made by police in the run-up to their entrance. Indeed, the majority has no trouble concluding that, after waiting ten hours for Krause to exit his house, waiting a minute longer was unnecessary. True, the majority concedes, "the plan did not end well." *Supra* at 7. But the majority appears to sanction the officers' conduct in arriving with blood and thunder, detonating a flash bang despite the fact that Krause was sleeping, and pre-engaging the automatic-fire modes on their weapons, thereby ensuring that a single trigger pull would result in a fusillade.

Claims against officers for use of excessive force during a stop or arrest are properly analyzed in keeping with "the Fourth Amendment's prohibition against unreasonable seizures of the person," wherein the "reasonableness" of a particular seizure "depends not only on *when* it is made, but also on *how* it is carried out." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). This determination requires "a careful balancing of 'the nature and

quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Of course, the "reasonableness" inquiry must be judged objectively, from the perspective of a reasonable officer at the scene, not based on hindsight, and must allow for "the fact that police officers are often forced to make split-second judgments." *Id.* at 397.

But I struggle to understand why the majority's analysis is bereft of any examination into the officers decisions not to wait longer, or to leave Krause asleep while apprehending him, or at minimum to shoot merely in order to incapacitate, rather than to destroy. *Compare Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006) ("We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law."). The case *sub judice* is unlike *Plumhoff*, where a fleeing, reckless motorist "never abandoned his attempt to flee" during the 10-second span when police shot him 15 times. 134 S. Ct. at 2022. Here, Krause—who was admittedly armed with a gun and seemingly eager to die—started awake, fired once, and died in a hail of 20 bullets.

Once Krause fired, it is clear that the officer's decision to return fire was reasonable. But surely this court is able to question also the pre-shooting conduct by law enforcement. *See, e.g.*, *Claybrook v. Birchwell*, 274 F.3d 1098, 1105 (6th Cir. 2001) (considering earlier shooting in assessing the reasonableness of officer's ultimate use of fatal force); *see also Terebesi v. Torreso*, No. 12-3867, 2014 WL 4099309, at *11-12 (2d Cir. Aug. 21, 2014) ("Our case law thus clearly establishes that planners may be liable under section 1983 to the extent that a plan for a search or seizure, as formulated and approved by those defendants, provides for and results in an unconstitutionally excessive use of force."); *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 22 (1st Cir. 2005) ("[O]nce it is clear that a seizure has occurred, the court should examine the actions of the government officials leading up to the seizure.") (quotation omitted); *Abraham v. Raso*, 183 F.3d 279, 291-92 (3d Cir. 1999) (disagreeing with "those courts which have held that analysis of 'reasonableness' under the Fourth Amendment requires excluding any evidence of events preceding the actual 'seizure.'"); *Billington v. Smith*, 292 F.3d 1177, 1188 (9th Cir. 2002) (Police "could be held liable for shooting the [suspect] – even though they reasonably shot him at the moment of the shooting – because they used excessive force in

creating the situation which caused [the man] to take the actions he did.") (quotation omitted); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1189 (10th Cir. 2001) (The "totality of the circumstances surrounding a seizure embraces conduct immediately connected with the seizure, such as police conduct arguably creating the need for force where use of excessive force has been alleged.") (quotations omitted); *Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir. 1994) ("Obviously, events immediately connected with the actual seizure are taken into account in determining whether the seizure is reasonable."); *but see Waller v. City of Danville*, 212 F. App'x 162, 171 (4th Cir. 2006) ("Although circuits differ on the question of how pre-shooting conduct should be weighed in an excessive force case, this circuit has repeatedly held that such conduct is generally not relevant and is inadmissible.").

If officers had decided, for example, to carry with them a grenade launcher, or call down a strike from a Predator drone, or take other actions which recklessly created excessive risk, this court would be justified in asking whether officers acted unreasonably in their preparations. *Compare Bing ex rel. Bing v. City of Whitehall, Ohio*, 456 F.3d 555, 570 (6th Cir. 2006) (Even "if the police had a great enough interest to use deadly force against [defendant], it does not follow that they may do so in any way they desire, say, by burning down his house rather than shooting at him."). It is equally appropriate that we inquire why officers were justified in entering with their weapons set to fully-automatic fire. I cannot accept the blind conclusion that this action was reasonable.

What is more, it is deeply troubling to see that, before launching their raid against the sleeping Krause, police considered other options, including the truly outrageous possibility of "using the SWAT team's tank to bring down the exterior wall of the bedroom and to seize Krause in that way." *Supra* at 3. This deliberation is disturbing not for the fact that police opted for a different choice, but because such a shockingly militarized option was even a consideration in the apprehension of a low-level drug dealer. In comparison, the officers' choice merely to use fully-automatic rifles, riot shields, and flash-bang grenades seems almost reserved. But it is precisely this sort of jurisprudential creep which must be resisted at all costs; indeed, as the Supreme Court long ago warned, "[i]t is the duty of courts to be watchful for the constitutional

rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis* ['resist the beginnings'].'' *Boyd v. United States*, 116 U.S. 616, 635 (1886).[1]

The doctrine of qualified immunity serves the importance purpose of "protect[ing] the State and its officials from overenforcement of federal rights," *Johnson v. Frankell*, 520 U.S. 911, 919 (1997), allowing "officials [to] act without fear of harassing litigation," *Davis v. Scherer*, 468 U.S. 183, 195 (1984). But we must not lose sight of the fact that, "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be *made to hesitate*." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (emphasis supplied). This court cannot condemn the actions of officers "from the peace and safety of [our] chambers with the 20/20 vision of hindsight." *Supra* at 8 (quotation omitted). But it is equally incumbent on us, in discharging our duty to "say what the law is," that we craft a jurisprudence that will empower officers to eliminate a threat while still encouraging them to preserve life. *See Garner*, 471 U.S. at 10-11 ("The use of deadly force is a self-defeating way of apprehending a suspect"; "[i]t is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

There was no need for Matthew Krause to die. Despite his threats that he might "come out shooting," as officers prepared to enter his bedroom he was asleep, posing a danger to no one. In facing such a suspect, police must do more than merely select from an array of deadly options that threaten an unreasonable risk of death—at least when safer, simpler options remain. It is not our duty to second-guess law enforcement. But is emphatically our duty to ensure that the law reflects our society's commitment to saving lives, not meaninglessly taking them.

For these reasons, I respectfully concur in part and concur in the judgment.

---

[1]Police action that today is borderline—but ultimately immunized—will tomorrow be "clearly established" and shielded beyond dispute. As one commentator has recognized in a related context, "[a] 'steady drumbeat' of [Fourth Amendment] violations that will not be subject to [the exclusionary rule] will become more and more accepted—not as technical violations—but as accepted behavior. . . . [W]hat will be considered egregious enough to justify exclusion will also be influenced, resulting in increasingly diminished respect for the right to be secure over time." Thomas K. Clancy, *The Fourth Amendment's Exclusionary Rule as a Constitutional Right*, 10 OHIO ST. J. CRIM. L. 357, 383 (2013) (footnote omitted).