**Douglas BURNS, Plaintiff,**

v.

**CITY OF REDWOOD CITY, et al., Defendants.**

**No. C 08–2995 RS.**

United States District Court, N.D. California, San Francisco Division.

Aug. 25, 2010.

Michael J. Haddad, Julia Sherwin, Haddad & Sherwin, Oakland, CA, Donald L. Galine, Law Offices of Donald L. Galine, San Mateo, CA, for Plaintiff.

Joseph C. Howard, Jr., Howard Rome Martin & Ridley, Redwood City, CA.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

RICHARD SEEBORG, District Judge.

### I. INTRODUCTION

On April 1, 2007, plaintiff Douglas Burns had the misfortune of suffering a diabetic

emergency in a very public setting. Several police officers apparently mistook his confused and erratic behavior for symptoms of intoxication and, ultimately, five officers wrestled him forcibly to the ground. Before the struggle ended with Burns bleeding and in handcuffs, the officers deployed pepper spray, nunchakus and a steel baton. The officers cited Burns for battery of a police officer and resisting arrest. An emergency medical technician who arrived at the scene to address any burns or irritation from the spray verified that Burns was in fact suffering from diabetic shock and administered treatment. This lawsuit arises out of that incident and seeks redress for the injuries Burns sustained. He advances several claims for relief against the officers in their individual capacities, as well as against Redwood City (the "City") and the Redwood City Police Department (the "Department"). The municipal defendants and individual police officers Jamie Mateo, David Gough and Ramiro Perez move for summary judgment on all plaintiff's claims.[1] For the reasons stated below, Officer Perez is entitled to summary judgment on all claims asserted against him under both federal and state law. Burns has not presented any material, disputed facts to support either his *Monell* claim against the municipal defendants or his unlawful arrest claim and these are also resolved at summary judgment in defendants' favor. All other defense motions for summary judgment are denied.

## II. RELEVANT FACTS

Douglas Burns is a professional bodybuilder. In the spring of 2007, he was forty-six years old, five feet, nine inches tall and weighed somewhere between 192 and 197 pounds. Sixth months prior to the incident, Burns earned the title "Mr. Natural Universe," which he represents reflects the highest echelon in drug-free men's body building. Burns also suffers from Type I diabetes, a chronic condition diagnosed at the age of seven. Burns advocates for diabetes education and is the co-author of *The Diabetes Antidote: An Exercise Prescription to Prevent Type 2, to Combat Type 1*.

Burns depends on insulin injections to regulate his blood sugar. If blood sugar levels drop below the normal range, any diabetic can experience hypoglycemia, or insulin shock. Apparently, a non-diabetic who experiences hypoglycemia will sense obvious alarms in response to the body's production of stress hormones. According to the plaintiff, a long-term sufferer can experience something called "hypoglycemia unawareness," where the body gradually stops producing stress hormones. In such a case, the person may not become aware of a problem until blood sugar levels plummet to a dangerous level. Severe symptoms often closely mimic the effects of intoxication by drugs or alcohol. The basic training required of all police cadets in California lists the following indicators of diabetic emergency: aggressiveness, combativeness, uncooperative behavior, confusion, a dazed appearance, decreased level of consciousness, and impaired motor skills.

On the evening of April 7, 2007, Burns planned to catch the 7:00 screening of a film at the Century 20 Theater in Redwood City. In the parking lot, sometime between 6:15 and 6:30, Burns injected insulin into his arm in preparation for the theater popcorn he expected to eat. En route to the ticket counter, Burns bumped into sev-

---

1. Officers Steven Sysum and Richard Harrington were named as defendants. Burns dismissed them from his Complaint in December of 2009. In his opposition papers, Burns also makes clear that he has voluntarily dropped the malicious prosecution and California Civil Code section 51.7 (the "Ralph Act") claim raised in his Complaint.

eral people he knew (first, a group of teens who knew of and admired his athletic pursuits and asked for training advice and, second, a couple with whom he was friendly) and chatted with each. He testified that by the time he reached the front of the ticket line, his blood sugar had begun to plummet and that he could no longer remember what film he came to see or even clearly read the print listing the available screenings. Eventually, he was able with some prompting to articulate his choice. He purchased a ticket and headed upstairs to the candy counter. By the time he reached the front of that line, he was only able to explain that he needed sugar. His request confused the sales clerk at the counter and she turned him away. Burns then maneuvered toward a soda fountain, where he proceeded to fill a paper cup partially with soda, pour it out, and repeat the process.

A theater employee asked a security guard to check on Burns. The guard, Mikhail Burlyga, testified that when he asked if anything was wrong, Burns did not respond but seemed to sway slightly from side to side. Burlyga assumed Burns was intoxicated and so escorted him down the stairs, returned the seven dollars Burns had paid for his ticket, and led him out the theater's exit doors. Concerned Burns might attempt to drive, Burlyga attracted the attention of a uniformed police officer, Jamie Mateo, standing nearby. At roughly the same time, a second theater employee telephoned the police to report Burns' strange behavior. When the dispatcher asked what Burns had done, the employee replied, "Nothing really. He basically just looks like he's on something. He can barely stand on his own." The dispatcher then alerted local officers that a man was loitering outside the theater. Officer Mateo also received this information via radio.

According to Mateo, Burns was staggering about in circles, counting the loose dollar bills he held in his hands. Mateo also noted something strange about Burns' stride: his steps were quite pronounced and high. As Mateo approached Burns, Mateo distinctly noted that he could *not* smell alcohol on Burns' breath but did think that Burns otherwise appeared to be under the influence of some sort of substance. Mateo asked Burns, "Sir, how can I help you?" He did not directly ask if Burns was ill or in need of medical assistance. Then, Mateo asserts that Burns unexpectedly "kind of" lunged toward him and uttered an expletive, along with several other incomprehensible phrases. Plaintiff notes that no mention of the profanity or the lunge appeared in Mateo's police report.

Although the area in front of the theater was crowded with onlookers, no other witness saw Burns lunge toward Mateo or heard him swear. Mateo avers he "felt threatened by Burns' behavior and hulking physique." Within a matter of minutes, Sergeant Gough arrived. Gough also testified that, as he approached the theater, Burns was disoriented, agitated and struggling to stand. Gough says he levied a series of questions at Burns: "What's the matter? What's your name? How can we help you?" Burns did not answer but instead parroted Gough's questions back to him. Gough later testified that it crossed his mind Burns might be under the influence of drugs or in the midst of a diabetic or other medical emergency. He did not, though, ask about Burns' medical needs. Because Burns' movements appeared generally directed toward the theater's entryway, Gough positioned himself between Burns and the door. Although the testimony of each officer differs somewhat, they collectively attest that Mateo stood somewhere between five and fifteen feet away from Gough.

According to the officers, Burns walked directly toward Gough, as if in an attempt to reenter the theater. Although Burns cannot actually remember much of the incident after his blood sugar levels dipped, he speculates that he presumably wanted to return to the area where sugar was available. Gough held up his hand against Burns' chest and told him to "stop." Burns then spun around and "high-stepped" confusedly back toward Mateo. Burns reasons that Gough knocked him off balance. A witness, David Morgan, told an interviewing officer that "[t]he man stumbled and bumped into a police officer. Then the officer pepper sprayed the man in the face." Mateo insists he was forcefully pushed. Gough testified that Burns shoved Mateo "with both hands" on the officer's chest or shoulder area.[2] It was then that Mateo sprayed a two to three second stream of pepper spray into Burns' face. Again, Mateo cites Burns' obvious strength, his bizarre behavior, and the fact that the officers had yet to conduct any form of weapons search as justification for the spray. Burns, who was clearly agitated, gripped his eyes with his palms and continued to walk about in an even more confused manner. Gough ordered that Burns drop to the ground but he did not respond. The security guard testified that he heard one of the officers tell Burns he was under arrest.

It is not clear exactly how Gough and Mateo physically brought Burns to the ground, but it is at least undisputed that roughly ninety seconds passed between when Mateo first approached Burns and when the officers wrestled him to the ground. It was the attempt to handcuff Burns that proved problematic. Gough and Mateo assert that Burns landed on his torso but with his hands folded beneath his waist. While the officers agree that he never swung his arms or attempted to strike them, they assert that he tensed up his body and limbs and would not submit to handcuffs. Mateo was positioned on Burns' right side, Gough on his left, and both officers tried to gain control of the closest arm. Mateo claims Burns at one point locked Mateo's hand in the space between Burns' bicep and his ribcage. The officer insists this caused him great pain. As he was not strong enough to yank it free, Mateo used the butt end of his nunchaku tool to strike Burns in the upper shoulder area several times. Mateo did not discuss the pinned hand or any nunchaku blows in his report.

Burns vaguely remembers being thrust onto the pavement and can recall a painful sensation in his shoulder, but otherwise remembers little of the struggle: "I remember snippets of being—I remember my face being on the pavement. I remember smelling the pavement. I remember smelling my blood. I remember being bent over and just locking down . . . ." He disputes, though, Mateo's theory that he needed to use the nunchaku to free his hand. Multiple witnesses, including Officer Perez, who had arrived at the scene mid-fracas, testified that Burns' right arm was extended, as if Burns were engaged in a one-armed push up. Burns argues that, from this position, it would be unlikely that he would be able to maintain any sort of

---

**2.** The security guard, Burlyga, also stated in his deposition that he saw Burns push Mateo. Burns points out, though, that Burlyga never mentioned this fact in the report he wrote after the incident or in his interview with the RCPD. Apparently, Burlyga had applied for a position with the Department and, after the incident, was in contact with Mateo. On at least one occasion, Mateo took Burlyga for a "ride-along." Burlyga denies that the two discussed Burns' case in any detail. In his deposition—which occurred after the ride-along—Burlyga mentioned for the first time that, although certain other facts were fuzzy, he now distinctly remembered the push.

grip on Mateo's hand (or indeed, his entire "arm" as Mateo somewhat inconsistently testified) between his bicep and ribcage.

Gough, meanwhile, was similarly engaged on Burns' left side. Apparently, he yanked and pulled on Burns' arm with such force that he tore and partially ruptured his own bicep. He states that when he noticed Burns bracing his forehead into the pavement, as if for leverage, he began to fear that Burns might be able to raise himself up off the ground. With his right hand, Gough drew his collapsible tactical baton from his utility belt. He did not extend the baton but did deliver three blows to Burns' ribcage. Defense witness, Pastor Joel Vano, observed part of the struggle and later sought out the department to provide his recollection. Vano testified that Gough did not raise the baton more than eight inches before striking Burns. In his opinion, Gough did not deploy "a huge amount of force" to do so. Pastor Vano also described Burns' resistance as "strenuous."

In the midst of this imbroglio, Officer Perez testified that he noticed Burns raise his hips slightly from the ground as Perez pushed his head downward. Worried that Burns was gaining leverage, Perez positioned himself at Burns' head and wrapped his arms around Burns' right arm and head (plaintiff's papers describe the position as a "half-nelson"). Perez used the strength of his two arms to squeeze Burns' head toward his right bicep. Officer Sysum arrived soon after and tried to assist by grabbing Burns' legs in something of a bear hug. Officer Harrington arrived last and endeavored to help control Burns' left arm. Plaintiff's witness David Morgan stated that he saw at least one of the officers kneel on Burns back and head area to force his face into the pavement. Mateo then wrapped his nunchaku tool around Burns' right wrist and cuffed that hand. Once both wrists were cuffed, the officers pulled Burns up from the ground, asked him to sit in the doorframe of a squad car, and called for medical assistance to wash away the pepper spray.

Before Burns received any medical attention, Mateo questioned him. Burns' medical witnesses explain that the adrenaline rush Burns experienced elevated his blood sugar levels slightly and explains why he was actually able to confer with and answer Mateo's questions. Mateo did not recite any *Miranda* warnings but did tape record the conversation. The transcript reflects that Burns did not seem to recall the struggle. When Mateo explained to Burns that he had resisted the officers, Burns apologized. Burns then explained that he is a diabetic and was in need of sugar or carbohydrates. When the medical team arrived, Burns was by that time seated on a planter, still in handcuffs. Gough warned the medical team that Burns suffers from diabetes. An EMT, Ian Lee, tested Burns' blood level. It was 26 mg/dl, or generally indicative (according to Burns' witnesses) of life-threatening diabetic hypoglycemia. Lee administered oral glucose. When Lee relayed Burns' blood sugar level to the officers, he testified that they seemed not to comprehend the significance of the precise number. As he stated, "I think it was kind of dismissed. . . . I don't believe that the police department is medically trained to understand what a blood sugar of 26 is."

Gough then told Mateo to cite Burns for violating California Penal Code sections 243(b) and 148: respectively, battery of a police officer and resisting arrest. Gough did so after he knew of Burns' medical condition. Burns suggests the officer's knowledge of his condition made issuance of the citations legally unsupportable. Gough and Mateo counter that determining whether a suspect has the requisite mental capacity to commit these offenses

is a prosecutor's rather than a police officer's role. The county prosecutor dropped all charges within two months.

On the evening in question, Burns wore denim jeans and a red, long-sleeved Adidas brand pullover. In photographs taken at the scene and according to witness testimony, Burns' sleeves were rolled up to the elbows. Burns also claims he religiously wore a medical alert bracelet on his left wrist. He insists it was on his arm that night. The bracelet is heavy, metallic and designed for ready visibility. The words "MEDIC ALERT" are inscribed into its front in large red font and "DIABETES—TAKES INSULIN—DOUGLAS CHRISTOPHER BURNS" is written across the bracelet's back. Although Burns cannot remember how it came to be there, someone at the scene apparently discovered the bracelet in Burns' pocket after the scuffle. The clasp was bent; Burns reasons that the bent clasp at least raises the inference that the bracelet came off in the struggle. All officers deny seeing the bracelet on his wrist.

As part of the requisite training at the police academy, all officers involved were trained to identify and handle a diabetic emergency. The Police Officer Standards and Training ("POST") handbook lists common indicators of insulin shock and points out that they "are similar to indications of alcohol intoxication or substance abuse." The handbook then expressly warns that an officer should "never assume that a person exhibiting these indicators is intoxicated without further questioning or assessment." Former and current Redwood City Chiefs of Police, Carlos Bolanos and Louis Cobarruviaz, agree that POST sets generally established standards for law enforcement officers in California. Although the officers all agreed that they were duly trained at their respective academies, they could not recall extensive significant,

subsequent training. They do note that they participated in First Aid training through the Department. As part of this training, the officers recall viewing a video that addressed diabetic emergencies. Following the incident with Burns, however, the department did devote several training sessions exclusively to the issue of just such emergencies.

Following the incident, Burns was transported to the San Mateo Medical Center Emergency Room. He received further treatment for hypoglycemia. Burns also sustained a brachial plexus tear which continues to bother him; bruising to the top of his head, nose, and the right side of his head; a blood bruise to the trapezius area of his right shoulder; a bruise on his left back rib area slightly larger than a silver dollar; scuffmarks on his hands, red lines around both wrists from either the handcuffs or the nunchakus; and abrasions on his face. Burns contends that the brachial plexus tear continues to plague him; he reports lingering numbness, tingling and weakness. His treating physician, Dr. Greenwald, has indicated that he does not expect that Burns will fully recover. Burns contends the brachial plexus injury has effectively curtailed his body building career.

### III. LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party "always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.,* "facts that might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (*citing Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348 (1986). It is the court's responsibility "to determine whether the 'specific facts' set forth by the non-moving party, coupled with undisputed

background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 631 (9th Cir.1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## IV. DISCUSSION

### A. Section 1983 Claim Against Individual Officers and Qualified Immunity

Burns alleges that Mateo, Gough and Perez employed excessive force in violation of his Fourth and Fourteenth Amendment right to be free from unreasonable search and seizure. Burns grounds this claim on section 1983 of the Civil Rights Act. That section provides, in relevant part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Title 42 U.S.C. § 1983. The defendants deny that Burns has raised a triable issue of fact to support the excessive force claim and also raise a defense of qualified immunity. Resolution of the motion involves two questions: whether the force used was excessive, and, if so, whether the three

police officers are nevertheless entitled to qualified immunity either because the law was not clearly established or because the officers made an objectively reasonable error in judgment.

■ The Supreme Court recently reexamined and refined the manner in which district courts are to proceed when, in an excessive force case brought under section 1983, government officials assert a qualified immunity defense. *See Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Under the framework previously set forth in *Saucier v. Katz*, a district court was required to determine as a threshold matter whether the plaintiff had shown the deprivation of a constitutional right. 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, the court would then analyze whether the right violated was clearly established in a "particularized ... sense: ... the relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. In *Pearson*, the Court dropped *Saucier*'s requirement that district courts adhere to the two-step sequence, especially where the "order of battle" framework required district courts to grapple with difficult questions of constitutional law even where resolution of the second prong would prove determinative. As the *Pearson* Court recognized, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson*, 129 S.Ct. at 818.

### 1. *Excessive Force*

■ A claim that a police officer employed excessive force implicates the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Accordingly, a police officer's actions are measured by a standard of objective reasonableness. *Id.* at 397, 109 S.Ct. 1865. The reasonableness of the force used to effect a particular seizure, in turn, is determined by "careful[ly] balancing ... 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (*quoting Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). More simply, "[t]he force which [i]s applied must be balanced against the need for that force." *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir.1997). *See also Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir.1994). The strength of the governmental interests depends on the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. It is also important to appreciate that police officers "are often forced to make split-second judgments," and that therefore "not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers" is a violation of the Fourth Amendment. *Id.* (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)). It is equally true, though, that even where some force is justified, the amount actually used may be excessive. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir.2002) (*citing P.B. v. Koch*, 96 F.3d 1298, 1303–04 (9th Cir.1996)).

■ The Ninth Circuit has emphasized that the balancing test just described "requires careful attention to the facts and circumstances of each particular case...." *Santos*, 287 F.3d at 853 (*quoting Graham*, 490 U.S. at 396, 109 S.Ct. 1865). *See also Deorle v. Rutherford*, 272 F.3d 1272, 1279–81 (9th Cir.2001). Because an excessive

force claim "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has also instructed that summary judgment in excessive force cases should be granted sparingly. *Santos,* 287 F.3d at 853 (*citing Liston,* 120 F.3d at 976 n. 10). "This is because police misconduct cases almost always turn on a jury's credibility determinations." *Id.*

■ Here, a key disputed fact implicates the degree of threat Burns' posed: a witness not associated with either party states that Burns merely stumbled and bumped into Mateo while the officers insist Burns aggressively attacked him. Construing disputed facts in a light most favorable to Burns, as the Court must on defendants' motion, a reasonable jury could find that the degree of force employed was excessive in light of the corresponding governmental interests at stake. To the extent Burns suggests that *no* amount of force can ever be reasonably levied against a mentally ill or incompetent person who poses a risk of harm to himself or to others, he is in error. On the other hand, Burns has raised a triable issue of fact as to whether the degree of force used *here* was excessive as juxtaposed with the level of threat presented.

First, the intrusion on Burns' liberty was by no means insubstantial. Mateo deployed pepper spray into Burns' face at close range for several seconds. Gough and Mateo then tackled him to the pavement. In the struggle to handcuff him, Burns sustained Mateo's nunchaku and Gough's baton blows and a torn brachial plexus from either Perez' half-nelson hold or some combination of the above. Burns' physician, Dr. Greenwald, testified that Burns' brachial plexus may never fully heal and will likely continue to cause pain and discomfort.

Next, the underlying "crimes" were not severe. The officers suspected Burns was intoxicated in public and ultimately cited him for battery of an officer and resisting arrest. In defendants' motion, they assert that Mateo deployed the pepper spray in response to Burns' sudden attack, the failed prior verbal commands, and the fact that Burns had not yet been checked for weapons. Burns insists he did not attack Mateo at all but was instead out of balance causing him to tumble into the officer. There is no evidence that Mateo gave *any* verbal command (he asserts instead that he asked general welfare questions) and no indication in the record that Burns was armed. Mateo did not instruct Burns to step aside or calm down and he gave no warning that a failure to do so would result in pepper spray. *Cf. Deorle v. Rutherford,* 272 F.3d 1272, 1282 (9th Cir.2001) (finding officer's use of beanbag shot against unarmed suspect could be unreasonable where there was no indication that he considered less extreme tactics or that he warned the suspect before firing). Burns is a strong man and, presumably, the receiving end of his out-of-balance stumble could be unpleasant and even intimidating. Mateo does insist he felt this way. Even so, "a simple statement by an officer that he fears for his safety or the safety of others," the Ninth Circuit has instructed, "is not enough...." *Deorle,* 272 F.3d at 1281. "[T]here must be objective factors to justify such a concern." *Id.*

Moreover, the officers admit they suspected Burns was intoxicated or mentally ill. They repeatedly use the term "psychotic" incident or episode to describe his behavior. Burns argues that, in light of their POST training on diabetic emergencies and the prominent medic alert bracelet he insists he wore that night, it also should have occurred to them that he was suffering from diabetic shock. Indeed, Gough in his deposition highlights how the possibility of a diabetic emergency crossed his mind. Burns' correctly suggests that

the condition itself has a role to play in the reasonableness inquiry. In *Deorle,* the Ninth Circuit emphasized that a suspect's apparent mental incapacity should inform the officer's approach:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation.... We do not adopt a per se rule establishing two different classifications of suspects ... [but] we emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham,* the reasonableness of the force employed.

*Deorle,* 272 F.3d at 1282–83. *See also Bryan v. MacPherson,* 608 F.3d 614, 626 (9th Cir.2010) (emphasizing that *Deorle's* analysis applies to intermediate levels of force and finding that the tasing of a mentally ill suspect without attempting less intrusive means could constitute unreasonable force). *See also McAllister v. Price,* 615 F.3d 877, 883–84 (7th Cir.2010) (finding that officer unreasonably "leapt" to conclusion that convulsing, semiconscious driver in the midst of diabetic shock was intoxicated and, as a result, force employed to throw driver from vehicle and onto pavement was excessive).

Drawing all factual inferences as required at this juncture in Burns' favor, a reasonable jury could infer that Burns did not pose an immediate threat of harm to the officers, the theater patrons, or to himself. The fact that only ninety seconds passed between the initial encounter and when Mateo deployed the pepper spray may suggest the officers lacked time to assess Burns' medical needs but it could also indicate that the pepper spray was a premature and objectively unreasonable response.

By any account, though, Burns resisted the officers' attempt to restrain him after the takedown and the escalation of force employed (nunchakus, a baton, and the half-nelson grip) corresponds to Burns' continued resistance. There is no evidence that the officers continued to beat or struggle with Burns once he was handcuffed. Burns disputes that his resistance justified the nunchakus (Burns reasons that Mateo's claim that his hand was pinned is unsupported by the facts), the baton (Burns' expert suggests releasing one hand from the struggle to deploy the baton was tactically unsupportable), and the half-nelson grip (again, the expert contends this grip was ill-advised and ineffective). Yet, even assuming the officers' force was commensurate with Burns' actions, the plaintiff argues the officers cannot invoke this later resistance as a defense where it was provoked by an earlier (alleged) constitutional violation.

The Ninth Circuit's analysis in *Billington v. Smith* is particularly instructive here. 292 F.3d 1177 (9th Cir.2002). The Court carefully reviewed circuit precedent defining the scope of liability where an officer's ultimate use of force was objectively reasonable but followed on the heels of a prior, unreasonable intrusion. *Billington* reiterated that, "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Id.* at 1189. On the other hand, "the fact that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend

himself." *Id.* at 1190. This is because "[t]he Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law, and negligent acts do not incur constitutional liability." *Id.* "An officer may fail to exercise 'reasonable care' as a matter of tort law yet still be a constitutionally 'reasonable' officer." *Id.* But if an officer's provocative actions are objectively unreasonable under the Fourth Amendment, liability is established, and the question becomes the scope of liability, or what harms the constitutional violation proximately caused. *Id.*

As explained above, there are genuine issues of fact as to whether the pepper spray and the take-down were constitutionally reasonable. Drawing all inferences in Burns' favor, it follows that this initial aggression "provoked" and proximately caused the blows and trauma that came of the struggle to handcuff Burns (including those inflicted by the other responding officers). Taking as true Burns' assertion that Mateo never asked him to calm down or to step back or warned him before the spray and tackle, a reasonable jury could also find that Mateo acted either intentionally or recklessly. It is clear Burns resisted and that force was necessary to subdue him. Yet, if it was unreasonable to pepper spray and tackle a disturbed man for his failure to answer welfare questions and for stumbling, the officers should not be excused for the blows that followed seconds later when he resisted handcuffs. To be clear, Burns has raised a triable issue of fact as to whether the spray and take-down were constitutionally excessive, given the degree of threat Burns presented. Similarly, there is a material question of fact as to whether such a violation "provoked" Burns' resistance. Mateo and Gough's motion for judgment as a matter of law, therefore, cannot be granted.

This analysis, however, does not so easily apply to Officer Perez, who was not involved or even present during the initial encounter with Burns. When Perez arrived, his fellow officers were already in the midst of a struggle to handcuff a suspect, and they were not having an easy time of it. Perez pulled Burns' head and neck toward his bicep to cause pain, it is true, but he states that he held the position only until Burns was handcuffed. Burns' expert testified that a half-nelson grip is always unnecessarily painful and ineffective. Other than this testimony, however, Burns provides no further evidence or explanation of how or why the technique is excessive in and of itself. Usually, a plaintiff must do more than present an expert's opinion that a particular tactic is per se unreasonable (otherwise, testimony of plaintiff's expert would always decide the constitutional question). *See Billington,* 292 F.3d at 1188 ("[E]ven for summary judgment purposes, the fact that an expert disagrees with the officer's actions does not render the officer's actions unreasonable.") (citation and internal quotation marks omitted). In contrast, courts in this Circuit have frequently recognized that a pain control grip or device can be employed to subdue a struggling suspect. *See, e.g., Brooks v. City of Seattle,* 599 F.3d 1018, 1026 (9th Cir.2006) (discussing how hair control grip or stun-level tasing may be appropriately deployed to control a suspect who refused to exit vehicle following traffic stop). Without more, the expert's admonition of Perez's technique is not sufficient evidence that the half-nelson grip was an unconstitutionally excessive response to Burns' resistance. Accordingly, plaintiff fails to point to any facts, disputed or otherwise, in support of the claim that Officer Perez employed constitutionally excessive force in confronting Burns.

## 2. Qualified Immunity

 The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Id.* at 814, 102 S.Ct. 2727. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *See Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law"). In other words, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.*

 Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis omitted). The "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that " 'insubstantial claims' against government officials [will] be resolved prior to discovery." *Anderson v. Creighton*, 483 U.S. 635, 640 n. 2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Accordingly, the Supreme Court has repeatedly stressed the "importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

In short, the qualified immunity doctrine protects an officer's reasonable mistake as to what the law requires. At least as to the pepper spray and take-down, the state of the law is well-established here in several respects. Most obviously, *Graham* instructs that an officer's degree of force must correspond to the perceived threat. Any reasonable officer should know that a "stumble and bump" is not the same thing as an "attack," especially if it is assumed that Burns never swore, lunged toward, or pushed Mateo. *Deorle* and its progeny also establish that apparent mental illness or incapacity often require tactics different from those designed for criminal suspects. Under the facts advanced by the plaintiff, Burns' obvious confusion and distress should have alerted Mateo and Burns to the possibility that pepper spray and a tackle might exacerbate, not ameliorate, the situation. Finally, *Billington* stands for the proposition that an unconstitutional provocation may create liability for subsequent, but reasonable acts of force causally connected to the provocation. The most recent of these cases, *Billington*, was decided eight years ago and all three continue to be cited favorably in this circuit and this district.

That said, Mateo and Gough insist that they made a reasonable mistake of *fact* as to the level of threat presented. Just as the question of whether a constitutional violation occurred here turns entirely on whose facts to accept, so too does the question of immunity. More simply, if

Burns behaved as the officers contend, their mistake of fact might be objectively reasonable. If he did not, the mistake may be deemed unreasonable.

■■■■■ The same cannot be said against Officer Perez's qualified immunity defense. As noted above, the record is devoid of any facts reflecting a constitutional violation by Perez. Yet, even if such could be identified, the undisputed facts demonstrate that Perez is entitled to qualified immunity. Multiple witnesses testified that Burns would not willingly submit to handcuffs.[3] The undisputed record certainly demonstrates that when Perez arrived on the scene, Mateo and Gough appeared to be struggling with a combative arrestee. In light of Burns' apparent strength and the physical positioning of the other officers, Perez explains he thought it made sense to focus on Burns' head and shoulder area. Given Perez' knowledge and Burns' resistance, there is no question that *some* force to subdue him was constitutionally appropriate. Burns does not disagree but argues the half-nelson itself was excessive. Plaintiff presents no case, and the Court is aware of none, that establishes the inappropriateness of the grip. To the contrary, at least one court in this district has recognized (although not in the qualified immunity context) that an officer's use of a *full* nelson choke grip was likely not excessive. *See Redmond v. San Francisco Police Dep't*, No. 07–4276, 2010 WL 2573978, at *4 (N.D.Cal. June 25, 2010) (recognizing that officer's "full-nelson sleeper grip" was not necessarily excessive where suspect attempted to swallow contraband). As de-tailed in the prior segment, courts also often uphold as reasonable various pain control grips deployed against resisting suspects. Even assuming Perez's conduct was constitutionally infirm, the law making it so was not settled and his mistake would have been a reasonable one. Officer Perez is therefore immune from liability.[4]

**B. *Monell Liability***

■■■■■ The municipal defendants move for judgment as a matter of law on Burns' *Monell* claim. In *Monell v. New York City Department of Social Services,* the Supreme Court held that a municipality can be found liable under section 1983 only where the municipality itself causes the constitutional violation. 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Respondeat superior or vicarious liability does not attach under section 1983. *Id.* at 694–95, 98 S.Ct. 2018. "It is only when the execution of the government's policy or custom ... inflicts the injury that the municipality may be held liable under [section] 1983." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (citation and internal quotation marks omitted). The Ninth Circuit has also established that "a local governmental body may be liable if it has a policy of *inaction* and such inaction amounts to a failure to protect constitutional rights." *Mortimer v. Baca,* 594 F.3d 714, 716 (9th Cir.2010) (citing *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (9th Cir. 1992)). Specifically, a municipality may be held liable for inadequate training of police officers if the failure to train amounts to

---

**3.** Even if he never swung at or kicked the officers, the plaintiff's characterization of his conduct after the take-down as "passive resistance" is not supported by any other witness. Especially as Burns cannot *remember* much of the struggle, this characterization carries limited weight.

**4.** As reflected in *Billington,* otherwise reasonable force may still result in compensable injury where the initial law enforcement encounter does not pass constitutional muster. Accordingly, an issue of fact remains as to whether Officers Mateo and Gough are responsible for any injury incurred by Burns as a result of the actions of Perez.

"deliberate indifference" to the constitutional rights of persons with whom its officers may come into contact. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 124, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *City of Canton*, 489 U.S. at 388–89, 109 S.Ct. 1197. As the Supreme Court explained in *City of Canton*, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390, 109 S.Ct. 1197. "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.*

■■■■ The Court in *City of Canton* further explained that, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 390, 109 S.Ct. 1197. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91, 109 S.Ct. 1197 (*citing Springfield v. Kibbe*, 480 U.S. 257, 268, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct," as "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Id.* at 391, 109 S.Ct.

1197. Finally, "for liability to attach ... the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* This means that, here, Burns must present evidence that the deficiency in training caused the police officers' unreasonable force.

■■■■ Unlike the question of the reasonableness of the force employed by the individual officers, the facts relating to officer training are not in dispute. The parties agree that diabetes is a fairly common disease in the United States; the municipal defendants point out that their officers have handled diabetic emergencies in the past without incident. Burns acknowledges that the officers did receive POST training specifically related to such emergencies in their respective academies (in particular, the officers were told never to assume a suspect exhibiting symptoms of intoxication is not actually in the midst of insulin shock), but points out that the Department lacks any written policies or guidelines on handling diabetic emergencies. The Department counters that its officers *do* receive periodic first aid training, even if the Department has never codified such guidelines in writing. Specifically, the officers in this case testified that part of this training involves a brief video that discusses the care of citizens in diabetic shock.

Accordingly, undisputed evidence reveals that the officers here *were* trained that the symptoms of diabetic shock mirror those of intoxication, that they should be alert to medic-alert jewelry and that a sufferer may not appreciate the wrongfulness of his or her conduct. Here, the municipal defendants argue that the situation escalated rapidly and that there was no time for the more fulsome assessment envisioned in the officers' training, that those officers did ask welfare questions, that Burns might have been dangerous

even if he was incapacitated, that those officer did not see an alert bracelet, and that even if they did not appreciate the legal meaning of his precise blood sugar level, they routed him to prompt medical care. Certainly, there may be a question of fact as to whether the officers *followed* their training in all meaningful respects. The very fact that Burns can measure their behavior against a fairly concrete list of requirements imbued at some point in their training suggests, however, that the department was not "indifferent" to the need for training here. The municipal defendants' motion for judgment as a matter of law on Burns' *Monell* claim must therefore be granted.[5]

### C. California Bane Civil Rights Act Claim

 California Civil Code section 52.1 establishes a claim for relief "against anyone who interferes, or tries to do so, by threats, intimidation, or coercion, with an individual's exercise or enjoyment of rights secured by federal or state law." *Jones v. Kmart Corp.,* 17 Cal.4th 329, 331, 70 Cal. Rptr.2d 844, 949 P.2d 941 (1998). Burns relies on the same excessive force argument detailed above to support this claim. Because the federal claim has survived Gough and Mateo's motion, so too must the state claim survive. Unlike under the federal counterpart, the municipal defendants may be held vicariously liable for an officer's violation of section 52.1. Cal. Gov't Code § 815.2(a). As the City and Department advance no arguments and present no evidence to indicate that Burns is precluded from recovering under this theory, their motion for summary judgment is denied.[6]

### D. False Arrest

The defendants further seek summary judgment on Burns' false arrest claim. Although it is not entirely clear from his Complaint, it seems that Burns grounds this claim under both section 1983 and state law. Burns argues that the officers lacked probable cause to arrest him, not at the time of the initial seizure, but when Mateo issued the two citations.

 A warrantless arrest of an individual in a public place for a crime committed in an officer's presence violates the Fourth Amendment if the arrest is not supported by probable cause. *See, e.g., Atwater v. City of Lago Vista,* 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The Ninth Circuit has also defined probable cause as follows: "when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that an individual has committed a crime." *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir.2007); *Gasho v. United States,* 39 F.3d 1420, 1428 (9th Cir.1994). While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir.1984) (*citing Henry v. United States,* 361 U.S. 98, 101, 80

---

**5.** Burns acknowledged at oral argument that his plea for injunctive relief was designed to accompany his *Monell* claim. Accordingly, the defendants' motion is granted as to Burns' injunctive relief plea as well.

**6.** For the same reasons discussed above regarding the absence of any basis to proceed against Officer Perez on Burns' federal claims, plaintiff's state law claims against that officer are subject to summary judgment.

S.Ct. 168, 4 L.Ed.2d 134 (1959)). Moreover, an arrest without probable cause is always an unreasonable seizure. *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir.1984).

The officers insist that probable cause warranted the initial seizure. Although Burns argues the force deployed in the process was unreasonable, this does not mean the officers lacked probable caused to arrest him, at the very least, for public intoxication. *See* Cal. Penal Code § 647(f). Burns' unlawful arrest claim focuses instead on the two citations Gough ultimately issued. These were for battery of an officer and resisting arrest. At the time Gough instructed Mateo to issue them, Gough was at least aware of Burns' medical condition. Burns argues it should have been obvious to the officers that his mental incapacity created a legal defense to these crimes. Accordingly, he contends probable cause no longer existed and that the citations were legally unsupportable.

▮ In response, Burns advances a theory of "continuing arrest," and relies on the Ninth Circuit's "dissipating probable cause" analysis from *United States v. Lopez*, 482 F.3d at 1072–74. There, the Court recognized that, "[i]n some instances there may initially be probable cause justifying an arrest, but additional information obtained at the scene may indicate that there is less than a fair probability that the defendant has committed or is committing a crime." *Id.* at 1073. "In such cases, execution of the arrest or continuation of the arrest is illegal." *Id.* (*citing United States v. Ortiz–Hernandez*, 427 F.3d 567, 574 (9th Cir.2005) ("A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated."); *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir.1988) ("As a corollary ... of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they

also may not disregard facts tending to dissipate probable cause.")). More simply, Burns suggests that once Gough knew of his medical condition, probable cause dissipated and he should have been released, not cited.

▮ Defendants argue that this is essentially what happened. First, they point out that Burns was no longer "seized" for purposes of the constitutional inquiry when the citations were issued. *See United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir.2004) ("A seizure occurs when a law enforcement officer through coercion, physical force or a show of authority, in some way restricts the liberty of a person.") (internal quotation marks omitted). The officers removed the handcuffs so that Burns could receive medical treatment and did not detain him further. At the time Mateo wrote the citations, Burns was in the midst of receiving medical care. He was taken to the hospital, not the police station, and he was free to leave. At the time the citations were issued, defendants insist, the arrest was over. *See, e.g., White v. City of Laguna Beach*, 679 F.Supp.2d 1143, 1155 (C.D.Cal.2010) ("[T]he mere issuance of a citation does not even constitute a seizure let alone a formal arrest."). Moreover, all charges against Burns were later dropped.

Defendants' analysis is more apt. At the time Mateo issued the citations, Burns was no longer under arrest. As the undisputed facts reflect that probable cause supported the initial seizure, defendants' motion for judgment as a matter of law as to the unlawful arrest claim must be granted.

E. *Negligence, Intentional Infliction of Emotional Distress, Battery Claims*

All defendants seek summary judgment on Burns' claims of negligence, intentional

infliction of emotional distress and battery. As against the officers, these claims all focus on the physical force deployed. Burns relies on a theory of respondeat superior to tie his emotional distress and battery claims to the municipal defendants. As against them, Burns contends that the City and Department's alleged failure to train the officers as well as their tolerance for unlawful conduct constituted actionable negligence.

Defendants' motion relies solely on an immunity defense. They suggest that section 835a of the California Penal Code as well as sections 820.2 and 815.2 of the California Government Code create immunity from suit where officers act reasonably and within the provisions of the state and federal constitution. Section 835a provides that "[a] peace officer who makes or attempts to make an arrest need not retreat . . . nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance." Section 820.2 employs similar language and hails from the California Tort Claims Act. That provision privileges police officers' discretionary decisions made during arrests. *See Blankenhorn v. City of Orange,* 485 F.3d 463, 487–88 (9th Cir.2007) (*citing Price v. County of San Diego,* 990 F.Supp. 1230, 1244 (S.D.Cal.1998); *Martinez v. County of Los Angeles,* 47 Cal.App.4th 334, 349, 54 Cal.Rptr.2d 772 (1996)).

■■■ These provisions plainly do *not* apply, however, to officers who use *unreasonable* force in effecting an arrest. *See id.* (*citing Scruggs v. Haynes,* 252 Cal. App.2d 256, 262, 60 Cal.Rptr. 355 (1967) ("[A] peace officer making an arrest is liable to the person arrested for using unreasonable force."); *Robinson v. Solano County,* 278 F.3d 1007, 1016 (9th Cir. 2002)). Notably, the Ninth Circuit in *Blankenhorn* rejected a defendant's re-

quest for summary judgment on an emotional distress claim where material facts could support a finding of excessive force. *Id.* at 487 n. 17. The Court reasoned that excessive force could qualify as the elemental requirement of "outrageous" conduct. Because there is a question of material fact as to whether the use of force employed by Officers Gough and Mateo was objectively reasonable, their argument is unpersuasive. Those officers' motion for judgment as a matter of law on the negligence, battery and emotional distress claims must be denied.

■■■ The municipal defendants cite to section 815.2 of the California Government Code for their immunity argument. That section provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Cal. Gov't Code § 815.2(a). This provision clearly allows for vicarious liability of a public entity when one of its police officers uses excessive force in making an arrest. *Blankenhorn,* 485 F.3d at 488 (*citing Mary M. v. City of Los Angeles,* 54 Cal.3d 202, 215, 285 Cal.Rptr. 99, 814 P.2d 1341 (1991) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct.")). Neither the City nor the Department argues that the arresting officers were acting outside the scope of their duties. Because the arresting officers are not entitled to summary judgment on the use of unreasonable force, neither are the municipal defendants entitled to immunity from liability under Government Code section 815.2. All defense

motions for judgment as a matter of law on these claims must therefore be denied.

## V. Conclusion

Construing the facts and drawing inferences in a light most favorable to Burns, a reasonable jury could find that Officers Mateo and Gough used excessive force in response to the threat Burns posed. Under the facts Burns presents, moreover, material disputes remain regarding whether the officers made an objectively reasonable mistake of law or fact such that qualified immunity cannot operate as a defense, at least at this procedural phase. Officer Mateo and Gough's motion for summary judgment of all claims—state and federal—that assume a constitutional violation involving excessive force or assert an immunity defense must be denied. Officer Perez's conduct, in contrast, did not operate as a constitutional violation and, in any case, he has demonstrated that he may assert qualified immunity. Perez' motion is granted as to all claims, grounded on either federal or state law, advanced against him. Finally, the officers' motion for summary judgment on Burns' false arrest claim must be granted.

The municipality's motion for summary judgment on Burns' *Monell* claim similarly must be granted. As Burns' plea for injunctive relief assumed a *Monell* violation, this plea must be denied as well. Insofar as the municipal defendants may be held vicariously liable for the officers' conduct under state law, it remains a party in this action to the extent of those claims.

IT IS SO ORDERED.